IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30080
Summary Calendar
_____


WAYMON E. FREEMAN,

Plaintiff-Appellant,

versus

RANDY L. HICKMAN; NATIONAL UNION
FIRE INSURANCE COMPANY OF
PITTSBURGH, PA; WAL-MART STORES, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Western District of Louisiana
(94-CV-531)
_____

August 29, 1996
Before GARWOOD, WIENER and PARKER, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Plaintiff-appellant Waymon Freeman (plaintiff) filed this suit

in Louisiana state court for damages arising out of an automobile

accident. Following removal to the district court below, a jury

awarded plaintiff $5,000 in general damages and $5,000 for past

medical expenses. Judgment was entered accordingly. On appeal,

_____

[*] Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

the plaintiff challenges the adequacy of this verdict.

## Facts and Proceedings Below

On September 8, 1993, defendant-appellee Randy L. Hickman (Hickman), an employee of defendant-appellee Wal-Mart Stores, Inc. (Wal-Mart), ran a red light and collided with the plaintiff's vehicle. Plaintiff filed suit in Louisiana state court, and the case was removed shortly thereafter because complete diversity existed between the parties.

At the ensuing jury trial, the defendants stipulated that Hickman, a Wal-Mart regional personnel manager acting within the course and scope of his employment at the time, was at fault for the accident. It was also stipulated that Wal-Mart and Hickman, as an employee of Wal-Mart, were insured by defendant-appellee National Union Fire Insurance Co. of Pittsburgh, Pennsylvania.

Plaintiff testified that he was wearing his seat belt at the time of the accident, but that the impact of the collision threw him to the passenger side of his vehicle; he also testified that he struck his knee on the steering column in the course of being thrown across his vehicle.

Hickman testified that, immediately following the accident, he approached the plaintiff as the plaintiff was exiting his vehicle, apologized and acknowledged his fault for the accident, and asked the plaintiff if he were "okay." Plaintiff responded that he was.

2

Hickman further testified that the plaintiff then proceeded to wrap a winch cable——attached to plaintiff's vehicle——around a pole and attempt to pull his (plaintiff's) collapsed fender away from the tire; during this process, the plaintiff never complained of nor exhibited any injuries. Plaintiff did not go to the emergency room or otherwise seek medical attention on the day of the accident.

Plaintiff testified that, upon returning home on the day of the accident, his knee had started to swell, his neck and shoulder were causing considerable pain, and he had a headache. He saw a doctor for the first time two days after the accident, and did not at that time complain about his knee. X-rays taken of the plaintiff's shoulder during this first visit to the doctor revealed no fracture or dislocation; however, the doctor did find "some mild A-C joint degenerative changes."

Following his second doctor's visit, at which time he again made no mention of his knee, plaintiff hired an attorney. Subsequently, on October 4, 1993, nearly a month after the accident, plaintiff went to see Dr. John E. Cobb (Cobb), an orthopaedic surgeon. At this time, plaintiff complained of his knee to Dr. Cobb. Following a week and one half of physical therapy and an MRI, Dr. Cobb performed arthroscopic surgery on plaintiff's knee to repair a torn medial meniscus. Plaintiff thereafter underwent two months of physical therapy for his knee.

At the time of trial, plaintiff had not seen Dr. Cobb

3

regarding his knee in ten months, and had not visited Dr. Cobb concerning his neck in fifteen months. Dr. Cobb testified that plaintiff had given no indication that he wanted to pursue additional surgery to his knee or any surgery to his neck at the time of trial, nor was there any evidence that such surgery would be necessary. Dr. Cobb also conceded that the pain in plaintiff's neck stemmed from a degenerative condition predating the accident. The plaintiff maintains that this condition was aggravated by the accident.

Finally, Dr. Cobb testified that the restrictions on plaintiff's activities as a result of his neck problem constituted a "common sense" approach to what he could and could not do—"a voluntary restriction program, just learn to live with it, learn what not to do and what to, that he can do without aggravating it." Testimony was given that the plaintiff continued to hunt, fish, and spend time in his "camp" since the accident.

At the conclusion of trial, the jury rendered a verdict that the plaintiff had incurred damages as a result of Hickman's negligence. The jury awarded the plaintiff $5,000 in general damages[1] and $5,000.00 in past medical expenses. The jury awarded the plaintiff "0" for future damages and future medical expenses.

---

[1] The jury responded "$5000.00" to the special issue on the verdict form which asked:

> "What amount do you find will adequately compensate the plaintiff for the damage sustained by him as a result of his injury from date of accident [] to this date?"

4

Counsel for the plaintiff did not move for judgment as a matter of law at any time during trial. Furthermore, plaintiff's counsel did not file a motion for a new trial, and opted not to seek a judgment notwithstanding the verdict in the trial court.

**Discussion**

The framework within which we are to review the plaintiff's claims on appeal depends on whether or not the plaintiff has properly preserved the issue of sufficiency of the evidence. If the plaintiff failed to preserve this issue, then we review the record in this case for *any* evidence supporting the jury's award of $5,000 in general damages and $5,000 in past medical expenses. *See* Fed. R. Civ. P. 50; *see also Great Plains Equipment, Inc. v. Koch Gathering Systems, Inc.*, 45 F.3d 962, 968 (5th Cir. 1995) ("Where a party has failed to preserve the issue of sufficiency of the evidence for appellate review by moving for judgment as a matter of law (formerly directed verdict) in the trial court, our inquiry is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency"); *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 & n.9 (5th Cir. 1996); *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 397 n.2 (5th Cir. 1995).[2]

---

[2] In *Scottish Heritable Trust*, the party challenging on appeal the sufficiency of the evidence moved for judgment as a matter of law "prior to the conclusion of *all* evidence" and also objected to the proposed jury charge. *Id.* at 610-11 (emphasis added). We held that sufficed.

If we were to determine, however, that the plaintiff has not waived his right to challenge the sufficiency of the evidence, then our task is to analyze the sufficiency of the evidence supporting the verdict. *See Polanco v. City of Austin, Texas*, 78 F.3d 968, 974 (5th Cir. 1996).[3] In *Polanco*, we observed that:

---

In the present case, the defendants submitted proposed joint jury instructions to which plaintiff's counsel agreed. In agreeing to these instructions, the plaintiff asked only that three "additional" instructions be included with those proposed by the defendant. And, of these three "additional" instructions, only one was not included verbatim in the defendants' proposed joint instructions. However, even if we were to view these three additional jury instructions as objections to the defendants' proposed joint instructions—and relevant to the issue of evidentiary sufficiency—these objections further neither of the above purposes of Fed. R. Civ. P. 50(b). Both the defendants' proposed joint instructions and the plaintiff's objections (additional instructions) were submitted to the court *before* trial—prior to the presentation of *any* evidence. Thus, there was no (evidentiary) sufficiency issue for the court to "re-examine" in light of these objections, or to which the "opposing party" might thereby be alerted.

Thereafter, during the week prior to trial, plaintiff caused to be filed yet again (a verbatim copy of) an instruction which had previously been filed with both the proposed joint instructions and the plaintiff's "objections" (additional instructions). The filing of this instruction brought the plaintiff no closer to fulfilling the purposes of Rule 50(b). There is no indication in the record that the plaintiff objected to the jury charge or otherwise raised any issue regarding the sufficiency of the evidence subsequent to the pre-trial filing of this instruction.

[3] In *Polanco*, the party challenging on appeal the sufficiency of the evidence did move for judgment as a matter of law during trial, but failed to renew its motion at the close of *all* the evidence. 78 F.3d at 975. We held in *Polanco* that the "failure to raise *another* motion for judgment as a matter of law is not detrimental to the City's insufficient evidence claims" as "[o]ur precedent makes clear that a strictly mechanical application of rule 50(b) is not required when the court reserves its ruling and the defendant has given notice of insufficiency." *Id.* (emphasis added).

6

"The standard for evaluating the sufficiency of evidence is whether the evidence has such quality that reasonable and fair-minded persons would reach the same conclusion. The Fifth Circuit has explained the standard as follows: 'We will reject a verdict in those instances when, despite considering all the evidence in the light and with all reasonable inference most favorable to the verdict, we find no evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial discretion could arrive at the same conclusion.'" *Id.* at 974 (citation omitted).

We need not determine which standard of review is appropriate in the present case, however, as our conclusion is the same regardless of which of these standards we employ. Even if we examine the *sufficiency* of the evidence supporting the verdict, we find that the evidence adduced at trial was of such quality and weight that reasonable and fair-minded men in the exercise of impartial discretion could arrive at the same verdict.

Evidence was presented demonstrating that, immediately following the accident, the plaintiff stated to Hickman that he was "okay" and set to work pulling his damaged fender away from his tire with a winch. Evidence was also adduced that the plaintiff's first visit to a doctor occurred two days following the accident, and that the plaintiff did not complain of pain in his knee during either of his first two visits to the doctor. Only after hiring an attorney did the plaintiff visit a doctor and complain of his knee.[4] Aside from the medical expenses relating to the plaintiff's

_____

[4] Testimony from an expert witness, Dr. Clifton Shepherd (Shepherd), was presented that the plaintiff's actions following the accident and preceding his first visit with Dr. Cobb suggested

7

knee, the plaintiff incurred medical expenses relating to his neck and shoulder.[5]  Evidence was presented, however, that the pain in the plaintiff's neck stemmed from a degenerative condition predating the accident.  After viewing this evidence in the light and with all reasonable inferences most favorable to the verdict, we will not disturb the jury's award of $5,000 for general damages (from the date of the accident to the return of the verdict) and $5,000 in past medical expenses.

Turning to the plaintiff's claim that the verdict was inadequate in that it made no award for future damages and future medical expenses, we find evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial discretion could arrive at the same conclusion.  The plaintiff's claim pertaining to future damages and medical expenses hinges entirely on the necessity of future surgery.[6]  Dr. Cobb testified that he and the plaintiff had last discussed the plaintiff's neck problem approximately fifteen months prior to trial, and that, as of that time, no surgery had been scheduled.  Additionally, Dr.

---

that the plaintiff's knee problems were unrelated to the accident. Dr. Cobb acknowledged that this was "one of the conclusions you could make."  Dr. Cobb testified that the plaintiff "certainly had significant wear in the knee before the accident."

[5]     It appears from the record that the plaintiff's first two visits to the doctor (prior to seeing Dr. Cobb) related to his shoulder, neck, and back, and that he saw Dr. Cobb an additional four times pertaining to his shoulder and neck.

[6]     Plaintiff contends that future surgery will result in "future pain and suffering and mental anguish."

Cobb testified that, in the fifteen months following that final discussion of the plaintiff's neck problem, plaintiff had not requested additional treatment to his neck nor indicated that he wanted to undergo surgery.  Dr. Spencer testified that the plaintiff would not benefit from the surgery to his neck that the plaintiff and Dr. Cobb had discussed at some point in his earlier visits.

Regarding the alleged necessity of future surgery to the plaintiff's knee, Dr. Cobb testified that he had not seen the plaintiff regarding the knee or anything else in the ten months preceding trial.  And, at the time of the plaintiff's final visit, Dr. Cobb testified that he was not recommending surgery to the plaintiff's knee.  Furthermore, Dr. Cobb testified that no surgery had been scheduled for the plaintiff's knee, nor had the plaintiff requested such surgery.  Dr. Cobb testified that surgery would only be considered if the plaintiff were to determine that he had such pain in his knee that "he just doesn't want to put up with it." Moreover, Dr. Cobb testified that, even if additional surgery were performed on the plaintiff's knee, the "primary" purpose of such surgery would be to correct a condition predating the accident:

> "Q:  And would you agree that the surgery which you have discussed with regard to the knee, the additional surgery would be related primarily to those problems, that is, the degeneration of the cartilage on the bone?
>
> A:   That's right.  It's to address the arthritis, the wear problems that exist in the medial compartment.
>
> Q:   And that existed there before the accident?

9

A:     It did, yes."

Finally, Dr. Shepherd testified that he examined the plaintiff's knee following the arthroscopic surgery and found no tenderness, no swelling, no bruising, a normal temperature, normal ligaments, and a smooth and full range of motion.

## Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

10